### BOLDFACE LICENSING + BRANDING, Plaintiff,

v.

### BY LEE TILLETT, INC., Defendant.

### Case No. CV 12–10269 ABC PJWX.

United States District Court, C.D. California.

March 11, 2013.

Andrew D. Sedlock, Jennifer K. Craft, Gordon Silver, Las Vegas, NV, Nina D. Boyajian, Susan L. Heller, Wendy M. Mantell, Greenberg Traurig LLP, Los Angeles, CA, for Plaintiff.

Elliot Brandt Gipson, Fayer Gipson LLP, Minh Zhen Marko Kuo, Gregory Alan Fayer, Fayer Gipson LLP, Los Angeles, CA, Lauren Heatwole McCorvie, McCorvie Law Firm PA, Orlando, FL, for Defendant.

## ORDER RE: DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

AUDREY B. COLLINS, District Judge.

Pending before the Court is Defendant and Counterclaimant By Lee Tillett, Inc.'s ("Tillett's") motion for a preliminary injunction, filed on February 11, 2013. (Docket No. 30.) Plaintiff and Counterdefendant Boldface Licensing + Branding ("Boldface") opposed on February 19 and Tillett replied on February 25. The Court heard oral argument on Monday, March 11, 2013. For the reasons below, the motion is GRANTED.

### BACKGROUND [1]

This case is the second of two trademark lawsuits involving Boldface's nationwide rollout of a cosmetics line under the mark KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOE, which is affiliated with the celebrity Kardashian sisters—Kourtney, Kim, and Khloe. By way of this motion, Tillett seeks to enjoin Boldface's use of the mark on its cosmetics throughout the United States, believing that the product launch has caused and will cause substantial consumer confusion with its federally registered KROMA mark for cosmetics. Similar issues were raised in the other lawsuit filed by a Los Angeles-based makeup studio using marks incorporating the word "Chroma" (the "Chroma case"). *See Chroma Makeup Studio LLC v. Boldface Group Inc.*, No. CV 12–9893 ABC (PJWx) (C.D.Cal., filed Nov. 19, 2012). The Court denied a preliminary injunction in the Chroma case because, although the plaintiff demonstrated that it owned valid common law rights in trademarks that were likely infringed, that it would be ir-

1. The Court has reviewed the parties' objections to evidence and to the extent those objections are inconsistent with the Court's ruling, they are OVERRULED. The Court GRANTS both parties' requests for judicial notice.

reparably harmed by Boldface's product rollout, and that the public interest was served by an injunction, the balance of hardships tipped strongly against an injunction. The plaintiff there had only common law rights in an unregistered mark, which were limited in scope, and Boldface would have been injured far beyond the rights the plaintiff had established had it been enjoined even in the limited area where the plaintiff's rights were protected. However, in this case, Tillett has a federally registered trademark, which significantly changes the Court's balancing and ultimately justifies issuing the injunction in this case.

Tillett is a Florida-based company that sells beauty services and all-natural cosmetics under the trademark KROMA [2] in the United States and the United Kingdom. (Tillett Decl. ¶ 3.) Tillett has used the KROMA mark in connection with cosmetics continuously since 2004, and the cost of its products range from $19 to over $100. (*Id.* ¶¶ 6, 8.) Since 2008, Tillett has sold on average $200,000 annually in KROMA products domestically, and has sold about $1 million in products in the U.K. (*Id.* ¶¶ 13–14.) Those sales occur online and in stores in Florida, California, New York, New Jersey, Hawaii, South Carolina, Pennsylvania, and Connecticut, as well as in the U.K. (*Id.* ¶¶ 17–19.) Tillett has promoted and advertised KROMA products throughout the United States, and, as part of accelerated efforts starting in 2009, its products have been featured on the Oscars and Emmys, in Fashion Week events in New York and Miami, at high-profile entertainment and fashion events around the world, and in nationally televised shows and events. (*Id.* ¶¶ 25–31.)

Tillett filed a federal trademark application for the KROMA mark on cosmetics on November 12, 2010. The U.S. Patent and Trademark Office ("USPTO") issued Registration No. 4079066 for the KROMA mark on January 3, 2012. (Tillett's Request for Judicial Notice ("RJN"), Ex. A.)

Before this lawsuit, Tillett claims to have had prior interactions with Kim Kardashian's representatives regarding KROMA products, although Kim Kardashian claims she was unaware of any of these interactions and that she never authorized her representatives to act as agents for her vis-a-vis Tillett. (*Compare* Tillett Decl. ¶¶ 32–35, Ex. D, *with* Kardashian Decl. ¶¶ 2–6.) For example, in May 2010, Tillett and a public relations and celebrity licensing company called TLK Fusion discussed possible product placement for KROMA products in the reality television show called *The Spin Room,*[3] on which Kim Kardashian was named as a producer. (Tillett Decl. ¶ 36, Exs. D, E.) Tillett and TLK Fusion also discussed the possibility of aligning KROMA products with a product line from Kim Kardashian. (*Id.* ¶¶ 37–38, Ex. F.) Tillett also sent Kim Kardashian a gift basket of KROMA products at TLK Fusion's request. (*Id.* ¶ 39.) Tillett and TLK Fusion never reached any agreement regarding the KROMA products. (*Id.* ¶ 40.)

Boldface was founded by two women in April 2012 as a "celebrity cosmetics and beauty licensing company" with a business model to design, develop, and market cosmetics and beauty-related goods. (Ostoya Decl. ¶¶ 3, 6.) Before forming the company, in October 2011 the founders of Boldface were approached by the Kardashians

---

**2.** Tillett's marks have varied over the years, but have always included the work KROMA. (Tillett Decl. ¶ 7.) Examples of Tillett's products appear in Appendix 1 to this Order.

**3.** Tillett mistakenly identified the show as *The SPINdustry,* but Boldface explains that the show was called *The Spin Room* and "The SPINdustry" was the title of the first episode. (Kardashian Decl. ¶ 2.)

to submit a proposal to jointly develop a beauty and cosmetics line affiliated with the Kardashian sisters. (*Id.* ¶ 8.) The founders spent six months researching and developing the products, during which time they came up with the brand name KHROMA BEAUTY, among others. (*Id.*) Boldface then entered a licensing agreement with the Kardashians' companies to use their names and likenesses in connection with the development, manufacture, promotion, and sale of cosmetics, beauty products, and other related goods that would be marketed in connection with the Kardashians' names and likenesses. (*Id.* ¶¶ 9–10.) During this period, Boldface claims not to have known about any prior interactions between Tillett and TLK Fusion or any representative of the Kardashians. (*Id.* ¶ 13.)

Before presenting possible brand names to the Kardashians, Boldface used an attorney to conduct a trademark search. (*Id.* ¶ 14.) The search yielded dozens of uses of the word "chroma" and certain variants in International Class 3 (which covers cosmetics and beauty products), and in light of this, Boldface concluded that the public was using the word "chroma" and its variants to denote "color." (*Id.* ¶¶ 14–15.) After presenting three possible brand names, Boldface and the Kardashians gravitated toward the mark KHROMA BEAUTY, although they also discussed using KARDASHIAN KHROMA. (*Id.* ¶ 11.)

In June 2012, Boldface filed two trademark applications with the PTO for the marks "KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOE" and "KARDASHIAN KHROMA," Serial Nos. 85/646521 and 85/642342, covering "personal care products including cosmetics, body and beauty care products" in International Class 3. (Tillett's RJN, Exs. C, E.) At this point, through news reports Tillett became

aware of Boldface's intent to use the word "Khroma" in connection with cosmetics, and sent Boldface a brief cease-and-desist letter on June 28, 2012, requesting a response within two weeks. (Tillett Decl. ¶¶ 41–42; Ostoya Decl. ¶ 25, Ex. A.) Boldface responded three weeks later in an email, on July 18, 2012, denying infringement, but not inviting any further response from Tillett. (Ostoya Decl. ¶ 26, Ex. B.) Tillett did not, in fact, respond to the email, and did not correspond again with Boldface until October 2012. (*Id.* ¶¶ 27, 29.)

In claimed reliance on Tillett's silence following its July 18 email, Boldface moved forward with the KHROMA BEAUTY product launch by, for example, putting products and packaging into production in August, inking deals with retail partners by September, and moving forward with press launches in September and October 2012. (*Id.* ¶ 28.) Boldface claims that, had Tillett responded to its July 18 email before it had moved forward in August, "Boldface could have changed the name without suffering serious harm." (*Id.* ¶ 31.) Amidst this activity, on September 26, 2012, the PTO issued office actions for both of Boldface's trademark applications initially refusing registration because, *inter alia*, Boldface's marks create likely confusion with Tillett's registration for KROMA on cosmetics. (Tillett's RJN, Ex. D.)[4] This prompted Tillett to send another—and much more detailed—cease-and-desist letter to Boldface on October 26, 2012. (Ostoya Decl. ¶ 29, Ex. C.) Tillett explains that it was unaware of Boldface's activities related to the KHROMA BEAUTY products during this time and, in fact, had no reason to know about the activities because Boldface's federal applications were for intent to use the marks in the future. (Tillett Supp. Decl. ¶ 6.)

---

**4.** Boldface has six months from the date of those actions to respond.

Boldface claims that, by the time it received the October letter, it could no longer viably change the name of the KHROMA BEAUTY products, so the parties engaged in settlement discussions. (Ostoya Decl. ¶ 30.) Those discussions obviously proved unsuccessful, and Tillett ended them on November 27, 2012. (*Id.*) Boldface thereafter filed this declaratory judgment action on November 30, 2012. (Docket No. 1.) In the meantime, the plaintiff in the Chroma case filed a motion for a preliminary injunction on December 5, 2012, and the Court denied it on January 23, 2013. Because it raised similar issues, Tillett waited for the resolution of that motion before meeting-and-conferring and filing the pending motion on February 11, 2013.

In parallel with these events and up through February 2013, Boldface indeed moved forward with its product rollout and expects that by the end of March 2013, KHROMA BEAUTY products will be in 5,321 stores in 48 states. (Ostoya Decl. ¶ 37.)[5] The products are priced between $6.49 and $19.99. (*Id.* ¶ 22.) Currently, the products can be found in the following retail stores: Ulta, Sears, CVS, Fred Meyer, HEB, Burlington, and Walgreens Puerto Rico, including on those retailers' websites. (*Id.* ¶ 17.) By this month, the products will also be available in Duane Reade stores. (*Id.*) The products are also currently available on amazon.com and drugstore.com, including its alternate website, beauty.com (*id.* ¶ 18), and starting in April 2013, the products will also be sold on Boldface's website devoted to the products, khroma-beauty.com (*id.* ¶ 20). Boldface is also in discussions with (and has received some

orders from) international distributors, including in the European Union, Australia, Canada, and Japan. (*Id.* ¶ 19.) Boldface claims it could have rolled out higher-end (and higher-priced) products, but it chose to create cosmetics for the mass market at accessible prices, which would more likely reach the Kardashians' fan base. (*Id.* ¶¶ 23–24.)

Based on orders already placed, Boldface expects substantial sales through December 2013. (*Id.* ¶ 34.)[6] Boldface has already shipped a substantial amount of the KHROMA BEAUTY products to retailers, along with displays it has paid to manufacture; it holds more products in its warehouse and on order; and it is taking orders for more products to ensure shipments are on time. (*Id.* ¶¶ 35–37, 42.) Because those orders were placed before this lawsuit was filed, Boldface claims it will incur prohibitive storage costs if it is enjoined from selling those products pending resolution of this case. (*Id.* ¶ 43.) Boldface has also rolled out an extensive advertising campaign through June 2013, primarily in print beauty and celebrity magazines; if an injunction issues, Boldface claims it will lose a portion of the money already spent and may breach its contracts with its retail partners. (*Id.* ¶ 40.)

On the other hand, Tillett claims that, as a result of the rollout of the KHROMA BEAUTY products, it has experienced a significant impact on its business. For example, Tillett identifies 10 instances of purported consumer confusion over its and Boldface's products. (Tillett Decl. ¶¶ 48–58, Ex. G–O.) Tillett's U.K. distributor has also experienced purported instances of

---

**5.** Examples of Boldface's products are in Appendix 2 to this Order.

**6.** Because Boldface has filed its revenue figures and other financial information under

seal, the Court will not set forth the exact figures in this Order, nor are the exact figures necessary to the resolution of this motion.

confusion. (Willey Decl. ¶¶ 9–13.) Tillett was notified of some of these alleged instances of confusion after emailing its clients and colleagues on February 5, 2013, stating that if they "express how [they] feel about this name trademark infringement and consumer confusion in an email form it would be of GREAT help. For instance, how do you feel about our name being copied and/or would you think a customer would be confused if our line was to be on ULTA shelves too?" (Tillett Decl. ¶ 53, Ex. N.) Moreover, Tillett's U.K. distributor believes that a retail department store chain called Debenhams passed on distribution based upon confusion with the KHROMA BEAUTY products, although the only evidence of this is an email declining the distribution with the subject line "KHROMA Beauty," when the chain's representative actually meant KROMA Makeup. (*Id.* ¶¶ 59–60; Willey Decl., Ex. B.) Tillett had been planning to use the Debenhams' deal to leverage similar deals with U.S. retailers. (Tillett Decl. ¶ 62.)

More generally, Tillett fears that its business will be irreparably harmed from Boldface's national product rollout. Tillett markets the KROMA products as all-natural, which is good for sensitive skin, and customers with sensitive skin might be placed at risk if they mistakenly purchase KHROMA BEAUTY products instead. (Tillett Decl. ¶¶ 63–64.) Further, Tillett claims that sales have dropped 25% since the launch of KHROMA BEAUTY products and that securing major retailers would be impossible in light of consumer confusion. (*Id.* ¶¶ 65–67.) In short, Tillett believes its business would be destroyed by the continued presence of the KHROMA BEAUTY products in the marketplace. (*Id.* ¶ 68.)

Boldface filed this lawsuit to obtain a declaration that the KHROMA BEAUTY products do not infringe Tillett's mark, and Tillett counterclaimed for trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), trademark infringement under Cal. Bus. & Prof.Code § 14200, and unfair competition under Cal. Bus. & Prof.Code § 17200. Tillett now moves for a preliminary injunction based upon all of these claims, although it focuses on its Lanham Act claims, conceding that the analysis is the same under sections 14200 and 17200. (Mot. 7 n. 2.)[7]

## LEGAL STANDARD

■ "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 877 (9th Cir.2009). This recitation of the requirements for a preliminary injunction did not completely erase the Ninth Circuit's "sliding scale" approach, which provided that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Vanguard Outdoor, LLC v. City of Los Angeles,* 648 F.3d 737, 739 (9th Cir.2011).

"In one version of the 'sliding scale,' a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were

---

7. Tillett named the Kardashians' individual companies in its counterclaims, but did not direct the motion against those counterdefendants. It believes—and the Court agrees— that any injunction against Boldface would effectively block all infringing activity by all of the counterdefendants.

raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.* at 740 (internal quotation marks omitted; brackets in original). This "serious questions" test survived *Winter*. *Id.* Therefore, "serious questions going to the merits and a hardship balance that tips sharply in the plaintiff's favor can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (internal quotation marks omitted).

## DISCUSSION

### A. Likelihood of Success on the Merits

■ In order to show trademark infringement under the Lanham Act, the plaintiff must demonstrate that the defendant is "using a mark confusingly similar to a valid, protectable trademark" owned by the plaintiff. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir.1999).

#### 1. *Validity*

■ To be valid, a trademark must be "distinctive." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir.2010). Marks are generally classified in one of five categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Id.* "Suggestive, arbitrary, and fanciful marks are considered 'inherently distinctive' and are automatically entitled to federal trademark protection because 'their intrinsic nature serves to identify a particular source of a product.'" *Id.* Generic marks are never entitled to trademark protection and descriptive marks may become protected if they have acquired "secondary meaning," that is, "acquired distinctiveness 'as used on or in connection with the [trademark owner's] goods in commerce.'" *Id.*

■ Federal registration of a trademark creates a presumption that the mark is valid, and where the PTO registers a mark without proof of secondary meaning, "the presumption is that the mark is inherently distinctive." *Id.* at 1113–14. This shifts the burden to the alleged infringer to demonstrate that the mark is not protectable. *Id.* at 1114. Here, Boldface has not challenged the validity of Tillett's registration of the KROMA trademark, which was registered on the Principal Register without proof of secondary meaning, so at this stage the Court assumes it is inherently distinctive and valid.

#### 2. *Likelihood of Confusion*

■ The touchstone of a Lanham Act claim is the likelihood of consumer confusion, which "requires the factfinder to determine whether a 'reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.'" *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir.2005). Likelihood of confusion is determined by evaluating the familiar factors outlined in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979): (1) strength of the marks; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Surfvivor*, 406 F.3d at 631. "[T]his eight-factor test for likelihood of confusion is pliant," so the "relative importance of each individual factor will be case-specific" and even a "subset of the factors" could demonstrate likely confusion. *Brookfield*, 174 F.3d at 1054.

■ Although this case implicates both "forward" and "reverse" confusion, it appears to be primarily focused on reverse confusion, given that Tillett's overarching concern is that the KHROMA BEAUTY

products will overcome Tillett's business. *(See, e.g.,* Mot. 2.) The difference between forward and reverse confusion turns on how consumers are potentially deceived as to source: "Forward confusion occurs when customers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder," whereas "reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Surfvivor,* 406 F.3d at 630 (citing *Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1129–30 & n. 5 (9th Cir.1998)). Claims of reverse confusion "protect the small senior user from losing control over its identity in 'the rising tide of publicity associated with the junior mark.'" *Walter v. Mattel, Inc.,* 210 F.3d 1108, 1110 (9th Cir.2000). For reverse confusion, the first three *Sleekcraft* factors are "pivotal." *Dreamwerks,* 142 F.3d at 1130.

### a. *Similarity of the Marks*

■ "'The more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion.'" *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137, 1150

(9th Cir.2011). In evaluating appearance, sound, and meaning, the Court follows three "axioms": "first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences." *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1206 (9th Cir.2000).

■ *Sound and Meaning.* Neither "kroma" nor "khroma" have any meaning in English, but Tillett claims without dispute that they are both derived from the word "chroma," which is the Greek word for "color." Moreover, the words "kroma" and "khroma" sound identical, despite the different spelling. *See Surfvivor,* 406 F.3d at 633 (treating "survivor" and "surfvivor" as phonetically "nearly identical"). These two subfactors weigh in favor of finding likely confusion.

*Sight.* As the marks are used in the marketplace, they often appear nearly identical to consumers. The heart of both parties' marks are, in fact, the words KHROMA and KROMA, which appear prominently on the parties' products in all capital letters in a similar font:

Further, despite Boldface's registrations and its claim that it "always" uses the complete mark of KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOE in advertising and on its products (Ostoya Decl. ¶ 16), the words "KHROMA" and "KHRO-

MA BEAUTY" often appear in the marketplace alone, apart from the Kardashians' names.[8] For example:

- On Boldface's Facebook and Twitter pages, Boldface calls the product line "Khroma Beauty"; magazines cover-

---

**8.** As Tillett points out, Boldface is not even using the actual mark KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOE on its prod-

ucts; instead, the actual use is "KOURTNEY KIM KHLOE KHROMA BEAUTY."

ing the product launch call it "Khroma Beauty"; and a search of Twitter messages (called "tweets") reveals that the users frequently call the product line "Khroma Beauty." (Kuo Decl. ¶¶ 2–5, Exs. A–C.)

- The KHROMA BEAUTY false eyelashes product bears the word KHROMA alone on the packaging. (Gipson Supp. Decl. ¶ 6, Ex. A.)
- Boldface's two websites for the KHROMA BEAUTY products are www.khromabeauty.com (United States) and www.khromabeauty.eu (U.K.). (Gipson Decl. ¶¶ 6–8.)
- On websites selling the KHROMA BEAUTY products like Ulta.com, the products are identified only as "Khroma Beauty" products and the additional words on the packaging are frequently illegible. (*Id.*, Ex. I.) [9]

Perhaps most telling, Boldface includes a "TM" symbol on its product packaging next to the word KHROMA, rather than at the end of the entire phrase, conveying the message that the prominent word KHROMA is Boldface's trademark.[10]

Moreover, both parties' marks are derivative of the word "chroma," but both have replaced the "C" with a "K." While Tillett also eliminated the "H," that variant of one letter is insignificant in this case, especially because the parties varied the word "chroma" in almost exactly the same way. *See Dreamwerks,* 142 F.3d at 1131 (expressing doubt that "substituting one vowel for another and capitalizing a middle consonant dispels the similarity between the marks.") Thus, the visual similarity factor weighs strongly in favor of likely confusion.

#### b. *Relatedness of the Goods*

Under this factor, parties need not be direct competitors, but the goods must be "reasonably thought by the buying public to come from the same source if sold under the same mark." *Rearden LLC v. Rearden Commerce, Inc.,* 683 F.3d 1190, 1212 (9th Cir.2012) (internal quotation marks omitted). To be related, the goods may be "complementary"; "sold to the same class of purchasers"; or "similar in use and function." *Sleekcraft,* 599 F.2d at 350. The ultimate question is whether customers are " 'likely to associate' the two product lines." *Surfvivor,* 406 F.3d at 633.

In this case, the parties both sell cosmetics, and in fact, some of their products are identical, such as blush, compacts, gloss, lip kits, foundation, eye shadow, and bronzer. The Ninth Circuit has found far more disparate products and services sufficiently related to support finding likely

---

**9.** In some reverse confusion cases, the addition of a "house mark" may aggravate, rather than mitigate, confusion by enhancing the risk that consumers would associate the plaintiff's products with the defendant. *See Glow Indus., Inc. v. Lopez,* 252 F.Supp.2d 962, 995 (C.D.Cal.2002). At this stage, though, there is no specific evidence to suggest that consumers would more likely associate Tillett's products with Boldface because the Kardashians' names and images appear on Boldface's products. This evidence is unnecessary because the similarity factor weighs strongly in favor of likely confusion even without it. *But see Cohn v. Petsmart, Inc.,* 281 F.3d 837, 842 (9th Cir.2002) (per curiam) (noting in reverse confusion case that the

"emphasis on [ ] housemarks 'has the potential to reduce or eliminate likelihood of confusion.' ").

**10.** In the Chroma case, the Court suggested that the plaintiff's focus on only the words KHROMA and CHROMA improperly attempted to strip away other portions of the parties' marks, contrary to the Ninth Circuit's dictate to look at the marks as a whole and as they appear in the marketplace. *See GoTo.com,* 202 F.3d at 1206. In that case, though, the record was not nearly as strong as it is here to demonstrate that Boldface's mark frequently appears simply as KHROMA or KHROMA BEAUTY.

confusion. *See, e.g., Dreamwerks,* 142 F.3d at 1131 (making movies and promoting sci-fi merchandise); *Brookfield,* 174 F.3d at 1056 (website providing entertainment information and website primarily renting and selling video tapes); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 155 (9th Cir.1963) (beer and whisky); *see also Gerawan Farming, Inc. v. Prima Bella Produce, Inc.,* No. CV F 10–0148 LJO JLT, 2011 WL 3348056, at *19 (E.D.Cal. Aug. 2, 2011) (corn and stone fruit/grapes). Although Tillett offers its products at a somewhat higher price point than Boldface's products and does not sell products to mass retailers, these differences are insignificant in this case. *See Glow Indus., Inc. v. Lopez,* 252 F.Supp.2d 962, 993 (C.D.Cal.2002) (finding "lotion, shower gel, and fragrance products" related and rejecting argument that products were unrelated because one was a "niche" product and the other was sold in mass-market retailers).

Boldface argues that this factor weighs less heavily in favor of finding likely confusion when "advertisements are clearly labeled or consumers exercise a high degree of care" in purchasing cosmetics, "because rather than being misled, the consumer would merely be confronted with choices among similar products." *Network Automation,* 638 F.3d at 1150. While this might have applied in the Chroma case to lessen confusion there, it does not mitigate confusion here. On this record, Boldface's products are not so "clearly labeled" to dispel confusion, and, because the marks are so similar, even purchasers of high-end cosmetics exercising great care in their purchasing decisions could easily be confused. A consumer might visit Ulta.com, for example, and see Boldface's products marked prominently with the words KHROMA or KHROMA BEAUTY, and either overlook the additional "H," or simply believe that Tillett had varied its name slightly. Under the circumstances here, this factor weighs strongly in favor of likely confusion.

#### c. *Strength of the Mark*

" 'The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws.' " *Network Automation,* 638 F.3d at 1149. In assessing a mark's strength, the Court must analyze both its "conceptual" and "commercial" strength. *Id.* Conceptual strength involves classifying the mark on the spectrum of distinctiveness, while commercial strength is based on " 'actual marketplace recognition,' " including advertising expenditures. *Id.; see also Glow,* 252 F.Supp.2d at 989 (noting that commercial strength is evaluated in light of "any advertising or marketing campaign by the junior user that has resulted in 'a saturation in the public awareness of the junior user's mark.' "). In reverse confusion cases, the Court evaluates the conceptual strength of the senior user, but for commercial strength, "the focus is on the relative strengths of the marks so as to gauge the ability of the junior user's marks to overcome the senior user's mark." *Visible Sys. Corp. v. Unisys Corp.,* 551 F.3d 65, 74 (1st Cir.2008).

As to the parties' comparative commercial strength, Tillett's KROMA mark has some commercial strength, but Boldface's marks are far stronger and could easily overwhelm Tillett's efforts. Since 2008, Tillett has sold on average $200,000 annually in KROMA products domestically, including in stores in Florida, California, New York, New Jersey, Hawaii, South Carolina, Pennsylvania, and Connecticut.[11]

---

11. The Court agrees with Boldface that Tillett's overseas sales and promotional activities do not demonstrate whether domestic purchasers recognize Tillett's mark in the United States. *See* 5 J. Thomas McCarthy, *McCarthy On Trademarks & Unfair Competition* § 29:2

Tillett does not provide context for these sales, so there is no way to gauge how much strength those sales created in the cosmetics industry generally, or even in the high-end cosmetics market specifically. *See Glow*, 252 F.Supp.2d at 983 (" 'Whether a volume of sales is significant will vary with the product and the market. The numbers that result in ... relief in one case may not be significant in another.' " (ellipsis in original)). Tillett has also promoted and advertised KROMA products throughout the United States; and its products have been featured on the Oscars and Emmys, in Fashion Week events in New York and Miami, at high-profile entertainment and fashion events around the world, and in nationally televised shows and events. Given this exposure, there is at least a fair chance that consumers of high-end cosmetics would recognize Tillett's KROMA products.

Compared to these efforts, though, Boldface's commercial strength far surpasses Tillett's. Boldface's marks are backed by the Kardashian's nationwide fame, and Boldface's product line has received extensive nationwide media coverage, has been shown to millions of viewers on an episode of the Kardashians' reality television show, has been promoted on each of the Kardashian sisters' websites and social media pages, and in the national press. The products are now in 5,321 stores in 48 states, and by April 2013 the products will be available on Boldface's website. And this is just Boldface's initial launch. Boldface's "ability to saturate the marketplace creates a potential that consumers will assume that [Tillett's] mark

refers to [Boldface], and thus perceive *that* the businesses are somehow associated." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir.2002) (per curiam).

 As for conceptual strength, Boldface has not challenged the presumption of inherent distinctiveness created by Tillett's federal registration. Even so, a federally registered mark is not automatically considered conceptually strong. *See Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1448–49 (9th Cir.1988). Tillett has not argued that its KROMA mark is arbitrary or fanciful, so the Court assumes for the purpose of this motion that Tillett's mark is suggestive.[12] As a result, "unlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak." *Brookfield*, 174 F.3d at 1058.

Boldface attempts to further weaken Tillett's KROMA mark by demonstrating that it exists in a "crowded field" of uses of similar marks on similar products. "[A] mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive.' It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Miss World*, 856 F.2d at 1449 (internal quotation marks omitted); *see also Glow*, 252 F.Supp.2d at 990–91 (finding suggestive mark weak because it "competes in an exceedingly crowded field of beauty products using the word 'glow' in some manner as a trade name or trademark").

(4th ed. 2013) ("In many situations, the foreign activities of a party are not relevant evidence in a trademark dispute concerning U.S. rights.").

**12.** In the Chroma case, the Court analyzed the distinctiveness of plaintiff's marks incorporating the word "chroma" and concluded

that they were suggestive. For those same reasons, the Court would likely conclude that Tillett's mark is suggestive here. But because Boldface has not attacked the validity of Tillett's registration and Tillett has not argued that the KROMA mark is arbitrary or fanciful, the Court assumes without analysis that Tillett's mark is suggestive.

Boldface argues that Tillett's KROMA mark is weak because there are "dozens" of third-party PTO registrations and applications incorporating the word "chroma" and its phonetic equivalents in the PTO's International Class 3 goods, some of which Boldface listed in its response to Tillett's June 2012 cease-and-desist letter. (Ostoya Decl., Ex. B; *see also* Boldface's RJN, Ex. 2 (including over 300 pages of PTO search results).) In the Chroma case, the Court relied on third-party registrations and applications incorporating the word "chroma" on cosmetics and beauty products to find the plaintiff's mark conceptually weak.

Upon further research and briefing from the parties in this case, the Court is now convinced that these third-party registrations are not probative of conceptual weakness without evidence that the marks were actually used in commerce and viewed by consumers. *See, e.g.,* 2 J. Thomas McCarthy, *McCarthy On Trademarks & Unfair Competition* § 11:89 (4th ed. 2013) (hereafter *McCarthy*) ("The mere citation of third party *registrations* is not proof of third party *uses* for the purpose of showing a crowded field and relative weakness" because "[t]hird party registrations are not evidence of use 'so as to have conditioned the mind of prospective purchasers.'" (emphasis in original)); *see also Olde Tyme Foods, Inc. v. Roundy's, Inc.,* 961 F.2d 200, 203–04 (Fed.Cir.1992) ("Much of the undisputed record evidence relates to third party registrations, which admittedly are given little weight but which nevertheless are relevant when evaluating likelihood of confusion. As to strength of the mark, however, registration evidence may not be given *any* weight." (emphasis in original)); *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1173 (2d Cir.1976)

("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers."); *AMF Inc. v. Am. Leisure Prods., Inc.,* 474 F.2d 1403, 1406 (C.C.P.A. 1973) ("The existence of [third-party] registrations is not evidence of what happens in the market place or that customers are familiar with them[.]"); *Teledyne Techs., Inc. v. W. Skyways, Inc.,* 78 U.S.P.Q.2d 1203, 2006 WL 337553, at *4 (T.T.A.B. 2006) ("[Third party] registrations are not evidence that the marks are in use, much less that purchasers are familiar with them."), *aff'd* 208 Fed.Appx. 886, 889–90 (Fed.Cir.2006) (unpublished disposition). Because Boldface has offered no evidence to show that any of the marks reflected in the registrations and applications were in fact used in commerce, this evidence does not show that Tillett's KROMA mark is weakened because it is used in a "crowded field" of similar marks on similar goods.[13]

Boldface has also identified other uses of the word "kroma" in the marketplace in connection with beauty services, such as "Kroma Kolor Laboratories," "Kroma Salon," "Salon Kroma of Cary," and "Kroma Hair Design." (Drapeau Decl., Ex. B.) Unlike PTO registrations and applications, these marks appear to be names of businesses used in the marketplace and likely have been viewed by consumers. Even so, they have little probative value in assessing uses of the word "kroma" to establish a "crowded field" for cosmetics: "Kroma Kolor Laboratories" appears to manufacture hair color, not cosmetics; and the other businesses appear to be hair salons, although one indicates it also provides make-

---

**13.** It also appears that some of these registrations have expired or have been cancelled due to non-use, and some of the applications have "intent to use" status only. By their nature, those applications and canceled registrations cannot be proof that those marks are used in the marketplace and viewed by consumers.

up services. This evidence does not show that the field of cosmetics is so crowded with marks similar to Tillett's KROMA mark that the strength of Tillett's mark is weakened.

Even if Boldface's evidence of a "crowded field" weakened the conceptual strength of Tillett's KROMA mark, this factor is significantly less important here where the parties' marks are so similar and the goods on which the marks appear are nearly identical. *See Brookfield,* 174 F.3d at 1058–59 ("Because the products involved are closely related and [the defendant's trademark] is nearly identical to [the plaintiff's] trademark, the strength of the mark is of diminished importance in the likelihood of confusion analysis.") (citing *McCarthy,* § 11:76 ("Whether a mark is weak or not is of little importance where the conflicting mark is almost identical and the goods are closely related.")); *see also GoTo.com,* 202 F.3d at 1208 (relying on *Brookfield* and *McCarthy* for same).

In the end, the parties' comparative commercial strength favors finding likely confusion, and the conceptual strength of Tillett's KROMA mark is neutral.

### d. *Actual Confusion*

Although not required, " 'actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion.' " *Network Automation,* 638 F.3d at 1151. Boldface claims that it has not received a single indication of confusion from its distributors, its retailers, or the press. (Ostoya Decl. ¶ 33.) In contrast, Tillett claims that commenters on social media and news sites regularly confuse the parties' marks (Tillett Decl. ¶ 47; Gipson Decl., Ex. L), and Tillett cites 10 purported instances of actual con-

fusion in the United States (Tillett Decl. ¶¶ 48–58).[14] Of these examples, eight show actual consumer confusion (all errors in original):

- An August 7, 2012, message from the owner of Lovelo Beauty LLC: Beauty Writer/Blogger, who wrote, "I have also heard that Kim K. and sisters are coming out with a line at the end of the year called Khroma ... is this related to you?" (Tillett Decl. ¶ 48, Ex. G.)

- An October 29, 2012 telephone call from a customer who said she was on the internet and was looking at the Kardashians' cosmetics line, but then saw Tillett's online presence, and called to ask if it was affiliated with the Kardashians. (*Id.* ¶ 50.)[15]

- A January 20, 2013, email from a client stating, "I was confused when I was in Ulta and wondered why you would change the spelling of your name." (*Id.* ¶ 52, Ex. J.)

- A February 10, 2013, email from a client stating, "During the holidays while passing through Sears, I saw a makeup display saying Khroma. I was so excited to see Lee's make up in the major department stores. As I got closer to the display it read Khroma Beauty by the Kardashian sisters. I was taken aback by how easy it was for the Kardashian's to infringe on Lee's trademark. I was so upset I even took a picture with my phone and sent it to Lee. Since then a few of my friends think that Less sold her company to the Kardashi[a]n's. My friends know that I have been going to Kroma for years and when they too saw it in the

---

14. Tillett cites other instances of actual confusion in the U.K., but again, this evidence is not relevant to the likelihood of confusion analysis. *See supra,* n. 16.

15. The Court rejects Boldface's argument that this instance of confusion should be disregarded as simply a "misdirected" phone call.

stores they thought it was Lee's brand just under the Kardashi[a]n's name. This is a wrong that needs to be made right." (*Id.* ¶ 54, Ex. K.)

- A February 5, 2013, email from a colleague stating, "As a colleague of yours I was shocked when I saw the Kardashian KHROMA Makeup line that was coming out into the market place ... At first glance I thought it was yours the font looks the same, how deceiving was that. When I worked for you I remember that you went to California to meet with the Kardashian's Public Relation Group at their request. I first thought that maybe you had sold them the rights to your company and makeup line. I could not believe that you would do that since you worked so hard developing, marketing of such a fantastic line. I'm sure you will prevail when everything is presented through your legal representatives." (*Id.* ¶ 55, Ex. L.)

- A February 5, 2013 email from a client stating, "I received a catalog in the mail from ULTA, featuring 'KHROMA' makeup line. I first thought this was your makeup line 'KROMA,' the name was almost identical as was the pronunciation of your brand. It was confusing, especially because the cheap prices listed on the ULTA catalog didn't seem to match your higher quality product price. I can see this causing a lot of confusion, even the style of the name 'KHROMA' is basically identical to yours." (*Id.* ¶ 56, Ex. M.)

- A February 5, 2013, email from a client stating, "I did, in fact, see something in a magazine for Khroma. Made me do a double take realizing this is NOT my favorite makeup product! I do believe it is 'too close' and actually resent another company using such a similar name." (*Id.* ¶ 57, Ex. N.)

- A February 7, 2013, email from a client stating, "When I have needed to make an appointment, I have become confused. Many times I Google the web for Kroma makeup. When I did this, I was provided with imagery and websites such as Ulta for your makeup. At first glance I thought it was your makeup. As I am a longtime loyal customer, I have no[w] overlooked this error. However, it can be as I am sure you are aware, very disconcerting to your typical customer. If I were just purchasing makeup I would most likely have bought the makeup this way. Since I am also a client for brow services & such, I continue to look further for your phone number and email to make a reservation. I do feel you have possibly lost much business due to this. I feel terrible for you. Your makeup is wonderful and the quality is unmatched in my opinion. You also give a delightful personal touch that no store bought makeup can deliver. If there is any way that you are able to get rid of this label confusion it would be great!" (*Id.* ¶ 58, Ex. O.)[16]

Boldface attacks the messages sent after February 5, 2013 because they came in response to an email from Tillett asking customers and colleagues if they have ex-

---

**16.** The Court agrees with Boldface that the email from a graphic artist that Tillett claims worked for Kim Kardashian in the past does not show actual confusion because the email itself does not reference the Kardashians. (Tillett Decl. ¶ 49, Ex. H.) The Court also agrees that the January 16, 2013 email from a client does not demonstrate actual confusion. (*Id.* ¶ 51, Ex. I.)

perienced confusion. Yet, there is no evidence that the respondents are employees of Tillett or otherwise "in close association and intimate contact" with Tillett, so the Court will not discount their statements on that basis. *See Walter,* 210 F.3d at 1111.

This evidence of actual confusion is not overwhelming, especially in light of Boldface's extensive product rollout. *Cf. Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1151 (9th Cir.2002) (finding one instance of actual confusion unpersuasive because "use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product." (emphasis in original)). Nevertheless, evidence of actual confusion is hard to come by at this stage and there are enough instances to favor finding likely confusion here.[17]

### e. Overlapping Marketing Channels

" 'Convergent marketing channels increase the likelihood of confusion.' " *Network Automation,* 638 F.3d at 1151. Here, there is some overlap between the parties' marketing channels, which weighs in favor of a likelihood of confusion. The parties target slightly different segments of the cosmetics market: Tillett's higher-end products are sold in its flagship store, hotels, and spas and through its website, while Boldface's products are lower-priced and sold in retail store chains and on their websites. Nevertheless, Tillett had discussions with TLK Fusion about possible product placement for KROMA products in projects related to Kim Kardashian, suggesting that there is overlap between the channels for Tillett's and Boldface's products.[18] Moreover, Tillett has made efforts to promote its products nationally and expand into mass retail stores, such as with the potential placement of its products with a U.K. retailer, which it claims could have spurred placement in domestic retailers as well. This evidence supports finding that the parties' marketing channels overlap enough to create likely confusion among consumers. The fact that both parties sell products online adds little weight to this factor. *See id.* (noting that "the shared use of a ubiquitous marketing channel" like the internet "does not shed much light on the likelihood of consumer confusion").

### f. Degree of Customer Care

Low consumer care increases the likelihood of confusion. *Id.* at 1152. This factor focuses on the nature, cost, and marketing channels of the goods at issue. *Id.* This factor weighs against finding likely confusion because Tillett sells "high end cosmetics" to an "upscale clientele" who likely exercise care in selecting Tillett's higher-priced products. (Tillett Decl. ¶ 5.) Tillett argues that the Court should focus on the purchasers of Boldface's mass-market products, who probably exercise less care in selecting cosmetics. This might be true when those purchasers select among competing lower-priced cosmetics lines, but here, purchasers of the lower-priced KHROMA products would likely take care before paying higher prices for Tillett's KROMA products.

The customer care factor, however, is entitled to only minimal weight in this case. As noted above, given the similarity of the parties' marks and relatedness of the goods on which those marks appear, even purchasers exercising a high degree of care would likely be confused, and some, in fact, have been confused. Therefore, even the high degree of care exercised by purchasers does not dispel the likely con-

---

17. The Court rejects Tillett's evidence of "online confusion" because it lacks foundation for how the identified websites actually operate. (Gipson ¶¶ 8–10, 18.)

18. While Kim Kardashian and Boldface deny knowledge of these discussions, there is no dispute that they occurred.

fusion created by Boldface's KHROMA BEAUTY mark.

### g. *Intent*

The intent factor generally carries minimal weight because " 'an intent to confuse customers is not required for a finding of trademark infringement.' " *GoTo.com*, 202 F.3d at 1208. On the other hand, " 'intent to deceive is strong evidence of a likelihood of confusion' " because, " '[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived.' " *Entrepreneur Media*, 279 F.3d at 1148. Therefore, "[w]here an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse." *Id.*

This case, however, is one of reverse confusion, so the intent inquiry must focus on "whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir.2000); *cf. Cohn*, 281 F.3d at 843 (citing *Commerce* and finding intent factor neutral because "Cohn did not present evidence that Petsmart intended to copy Cohn's mark or that Petsmart should have known of Cohn's senior trademark rights."). Thus, in a re-

verse confusion case, the intent factor favors finding likely confusion " 'where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark[.]' " *Surfvivor*, 406 F.3d at 634.

Here, Boldface was unquestionably aware of Tillett's rights and still proceeded with the multi-million-dollar rollout of the KHROMA BEAUTY product line. As early as January 2012, Boldface had constructive knowledge of Tillett's rights when Tillett's registration issued. It is unclear whether Boldface's initial trademark search uncovered Tillett's registration (although even a cursory PTO search should have) [19]; yet, by June 2012, Boldface had actual knowledge of Tillett's rights through Tillett's first cease-and-desist letter. Undeterred, Boldface began its extensive KHROMA BEAUTY product rollout in August 2012 that has continued unabated, even after Boldface received refusals of its trademark applications from the PTO in September 2012, putting Boldface on notice that its marks created likely confusion with Tillett's registration; after Tillett sent a second cease-and-desist letter in October 2012; and after settlement negotiations ended in November 2012.[20] This factor therefore weighs in favor of likely confusion.

### h. *Expansion of Product Lines*

The expansion of product lines factor does not carry much weight here because

---

19. (*See* Mantell Decl. ¶ 2 (explaining that PTO search submitted in Boldface's RJN, Ex. 2, did not contain the results of the initial search conducted by Boldface's counsel before adopting the KHROMA marks).)

20. The Court need not resolve the parties' dispute over whether Kim Kardashian knew about Tillett's interactions with TLK Fusion in 2010 because, even absent this evidence, the record amply demonstrates Boldface's knowledge of Tillett's rights and its calculation to move forward with the KHROMA BEAUTY

products notwithstanding. The Court also fails to see the significance of Tillett's prior application for the KROMA mark, which was denied by the PTO in light of a then-active registration for the mark "KROMA BONDZ" on cosmetics, which has since been cancelled. (Opp. 6.) In any case, when Tillett applied to register the mark KROMA in 2004, the company that owned the KROMA BONDZ mark had ceased doing business, although its mark was still on the Principal Register. (Gipson Supp. Decl., Ex. J.)

the parties already directly compete with overlapping products. *See Network Automation,* 638 F.3d at 1153 (finding expansion factor "unimportant" because parties already directly competed). Even so, Tillett offers evidence that, as of 2009, it has increased its efforts to promote the KROMA products nationally and attempted to expand beyond its current retail locations through discussions with a U.K. retailer that may have spurred expansion into additional U.S. retail markets. This evidence suggests a "'*strong* possibility of expansion into competing markets.'" *M2 Software, Inc. v. Madacy Entm't Corp.,* 421 F.3d 1073, 1085 (9th Cir.2005) (emphasis in original). This factor thus favors finding likely confusion.[21]

### 3. *Conclusion on the Merits*

An overall evaluation of the *Sleekcraft* factors demonstrates that a factfinder would likely find a likelihood of confusion here. Six of the factors favor Tillett: similarity of the marks; relatedness of the goods; actual confusion; overlapping marketing channels; Boldface's intent; and expansion of product lines. The other two factors either weigh partly in Tillett's favor or are neutral: Boldface's commercially strong mark supports finding likely confusion, although the conceptual strength of Tillett's mark is neutral; and the customer care factor has little impact on the analysis. Therefore, Tillett has demonstrated likely success on the merits of its infringement claims.

### B. Likelihood of Irreparable Harm

Tillett argues that irreparable harm may be presumed from its showing of likelihood of success on its trademark infringement claims. That proposition is doubtful following the Supreme Court's decisions in

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) and *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). *Cf. Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 994–95 (9th Cir.2011) (per curiam) (rejecting long-standing rule presuming irreparable harm from a likelihood of prevailing on the merits of a copyright infringement claim in light of eBay and Winter). *But see Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 877 (9th Cir.2009) (accepting the presumption of irreparable harm upon a showing of trademark infringement without analysis). The Court need not decide whether a presumption of irreparable harm still exists in trademark cases because Tillett has shown actual irreparable harm here.

■■■ Tillett has demonstrated that it will likely lose business opportunities, customers, and goodwill due to Boldface's use of the confusingly similar KHROMA BEAUTY marks. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 841 (9th Cir.2001) (finding loss of customers and goodwill created irreparable harm). The Court has little doubt that, in short order, the KHROMA BEAUTY products will likely eliminate Tillett's business entirely, creating irreparable harm sufficient to justify an injunction.

Boldface argues that Tillett has not shown irreparable harm because it unreasonably delayed in enforcing its rights following Boldface's July 2012 response to Tillett's June 2012 cease-and-desist letter. *See, e.g., Oakland Tribune, Inc. v. Chronicle Publ'g Co.,* 762 F.2d 1374, 1377 (9th Cir.1985) ("Plaintiff's long delay before

---

**21.** Boldface attacks Tillett's lost opportunity with a U.K. retail chain on various grounds. Even assuming these attacks are meritorious, Boldface's nationwide presence likely eliminates Tillett's current and future opportunities for expansion into mass-market retailers, creating significant irreparable harm.

seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *McCarthy*, § 31:32 ("It has often been held that unreasonable delay in filing suit and/or moving for a preliminary injunction can contribute to a defeat of a motion for preliminary injunction not upon the ground of laches, but for the reason that delay negates the moving party's ability to show the kind of 'irreparable injury' needed for preliminary relief."). Although Tillett could have moved more quickly in enforcing its rights, its delay was not unreasonable under the circumstances and does not undermine its claims of irreparable harm.

Boldface does not dispute that Tillett sent its first cease-and-desist letter promptly on June 28, 2012, when it learned of Boldface's planned product launch. Boldface responded three weeks later on July 18, 2012, defending the use of the KHROMA BEAUTY marks. In that email, Boldface did not request a further response from Tillett, and unsurprisingly, none came. Boldface chose to rely on Tillett's silence to move forward with its product launch beginning in August 2012; although Boldface does not identify a specific date in August, that could have been as few as 13 days later.

Tillett contends without contradiction that it was unaware of Boldface's activities in August and September 2012. (Tillett Supp. Decl. ¶ 6.) Boldface's applications were pending during this time, but because they were "intent-to-use" applications, they would not have suggested to Tillett that Boldface would move forward so quickly. An intent-to-use application can remain pending for years before the registration issues based upon use in commerce. *See Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 778 F.Supp.2d 1052, 1060 (C.D.Cal.2011) (explaining that the "intent-to-use" process allows for up to three years from a notice of allowance of a mark to demonstrate use in commerce). In any case, Tillett reasonably waited for the PTO to act on the applications to determine its next enforcement steps.

Then, on September 28, 2012, the PTO issued initial refusals, finding likely confusion between Boldface's marks and Tillett's mark. A month later, Tillett sent its second cease-and-desist letter on October 28, 2012. The parties engaged in settlement negotiations, which ended on November 27, 2012, and Boldface filed suit three days later. Tillett spent three weeks finding local counsel in this District (Tillett Supp. Decl. ¶ 14), and by the time it found counsel, the preliminary injunction motion in the Chroma case had been filed. It then reasonably waited for the Court to resolve the preliminary injunction motion, which raised issues that overlapped with this case. Once the Court denied that motion on January 23, 2013, Tillett filed the instant motion on February 11, 2013.

Again, while Tillett could have moved more quickly in seeking an injunction, the delay here was not unreasonable. *See, e.g.*, *GoTo.com*, 202 F.3d at 1209 (excusing five-month delay between filing suit and moving for preliminary injunction); *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir.1991) (excusing six-month delay between filing complaint and moving for preliminary injunction in part because the parties were engaged in settlement negotiations). The Court finds the likelihood of irreparable harm satisfied in this case.

## C. Public Interest

The public interest favors an injunction to prevent likely confusion in this case. *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 905 (9th Cir.2002); *Entrepreneur Media*, 279 F.3d at 1148. This is particularly true here because Tillett has presented evidence that confusion is al-

ready occurring, suggesting it will continue to occur absent an injunction. Given that Boldface has not contested validity and Tillett has shown a strong likelihood of prevailing, the Court finds no merit in Boldface's argument that an injunction would undermine the "broad societal interest in preserving common, useful words for the public domain." *Entrepreneur Media*, 279 F.3d at 1148. To the contrary, because Tillett has shown a likelihood of confusion, the paramount interest here is avoiding confusion among consumers. *See Internet Specialties W., Inc. v. Milon–DiGiorgio Enters.*, 559 F.3d 985, 993–94 (9th Cir.2009) (approving injunction that reflected "the usual public interest concern in trademark cases: avoiding confusion to consumers," and rejecting focus on the "burden imposed on the public by the injunction"). Nor is the Court convinced that the harm to Boldface's distributors and other third parties undermines an injunction here, given that they are selling Boldface's infringing products.

### D. Balance of Hardships

■ Even if Tillett has shown it will likely prevail on the merits of its claim, "an injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32, 129 S.Ct. 365. Instead, "[a] preliminary injunction is an extraordinary remedy never awarded as of right" and the Court "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 24, 129 S.Ct. 365. In trademark infringement cases, "a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises. Thus the relative size and strength of each enterprise may be pertinent to this inquiry." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir.1993).

■ Here, the Court is well-aware of the impact an injunction will have on Boldface's business, which could amount to millions of dollars in losses. But the Court is also fully convinced that withholding an injunction will destroy Tillett's business, which it has built over a decade, causing losses of hundreds of thousands (and perhaps millions) of dollars in past investment and future revenue. The difference between the two is that Tillett has superior rights to Boldface. As a result, the balance of hardships tips sharply in Tillett's favor.

The equities also rest firmly with Tillett. Boldface moved forward with its multi-million-dollar product rollout using a trademark it knew was similar to Tillett's registered mark based upon the thinnest of reeds: as few as 13 days of silence from Tillett after receipt of Boldface's July 18 email. While it admittedly could have changed the KHROMA BEAUTY marks at that time "without suffering serious harm" (Ostoya Decl. ¶ 31), it did not. And it forged ahead even when a neutral arbiter in the PTO sided with Tillett's view that the KHROMA BEAUTY marks caused likely confusion. This is precisely the type of case in which "any injury that [Boldface] may suffer if preliminarily enjoined may be discounted by the fact that [Boldface] brought the injury upon [itself] by intentionally adopting deceptively similar trademarks and packaging." *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F.Supp.2d 1271, 1282 (C.D.Cal.2008); *cf. Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir.1997) ("[A] defendant who knowingly infringes another's copyright 'cannot complain of the harm that will befall it when properly forced to desist from its infringing activities.'").

### E. Scope of the Injunction

Boldface briefly suggests that the injunction may only cover markets in which

Tillett does business, despite the existence of a federal registration, citing *Fairway Foods v. Fairway Markets*, 227 F.2d 193, 198 (9th Cir.1955). In *Fairway Foods*, the Ninth Circuit reversed the district court's grant of an injunction enjoining the senior federal registrant from using its trademark in territory occupied by the local junior user based only upon the registrant's desire to expand its business into that area in the future. *Id.* This doctrine is frequently called the *"Dawn Donut"* rule, based upon the rule announced in *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364 (2d Cir.1959):

> [I]f the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market, so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark.

*Id.* (citing *Fairway Foods* ).

The Ninth Circuit later explained that *Fairway Foods* addressed a narrow factual scenario; in that circumstance, "where the federal registrant and the intrastate user of conflictingly similar trade marks are using the respective marks in geographically separate and distinct market areas, with no real competition between them, and where there is no present likelihood that the federal registrant will expand his use into the area of use of the intrastate user, there is no cause shown for injunctive relief based on infringement." *Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 844 (9th Cir.1969). On the other hand, "where a federal registrant has expanded its business to the point that the use of the conflictingly similar marks by the registrant and the unauthorized user are no longer confined to separate and distinct market areas and there is established the likelihood of public confusion, the federal registrant is entitled under the

authority of the Lanham Act to injunctive relief." *Id.* (citing *Dawn Donut* ).

██ The Court declines to apply the *Dawn Donut/Fairway Foods* rule to this case for two reasons. First, Tillett sells products over the internet and across the country, has promoted them in nationwide media, and has engaged in discussions with a U.K. retailer in the hope of using that deal to spur further retail deals in the United States. As in *Mister Donut*, this evidence demonstrates a "present likelihood" that Tillett will expand nationally into areas occupied by Boldface. *(See* Ostoya Decl. ¶ 39 (stating that KHROMA BEAUTY products will be in 48 states by March 2013).)

Perhaps more important, applying the *Dawn Donut/Fairway Foods* rule in this reverse confusion case would have a significant adverse impact on Tillett's rights arising from its federal registration. As McCarthy explains, a federal registration creates a "nationwide *right,* but the injunctive *remedy* does not ripen until the registrant shows a likelihood of entry into the disputed territory" because there is no likelihood of confusion in that area unless and until the registrant enters that market or is likely to do so. *McCarthy,* § 26:33 (emphasis in original). This rule makes sense in forward-confusion cases with remote junior users occupying limited geographic locations as in *Dawn Donut* and *Fairway Foods,* but not so when the case involves reverse confusion with a nationwide junior user.

Reverse confusion is actionable because " 'the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and *ability to move into new markets.*' " *Commerce,* 214 F.3d at 444 (emphasis added). If, as in this case, the junior user is barred from using its mark in only those areas in which the registrant

does business, then it is free to occupy the rest of the country. That presence could be significant enough to eliminate the registrant's identity, goodwill, and reputation even in those areas the registrant occupies. And even if the registrant can preserve its identity in some areas, it has no incentive to expand its business into any territories already occupied by the junior user. Even though the registrant could get an injunction once it enters each new market, *see McCarthy*, § 26:33, it would likely have to expend significant time and money to dispel the confusion created by the junior user's prior presence. And by that point, it may be too late—the junior user's presence in other areas in the country may be so strong that the registrant's goodwill cannot be recovered. In order to protect a registrant's nationwide right from reverse confusion created by a nationwide junior user, then, an injunction must be nationwide as well. Because *Dawn Donut* and *Fairway Foods* did not address reverse confusion, the Court declines to limit an injunction on that basis.

Boldface further suggests that, because the KHROMA BEAUTY products are already in the marketplace and there are millions of units in production, an injunction barring the sale of these products would amount to a "mandatory injunction," which is " 'particularly disfavored.' " *Marlyn Nutraceuticals*, 571 F.3d at 879. The Court does not agree. While an injunction here might have the effect of requiring retailers to remove KHROMA BEAUTY products from shelves and preventing Boldface from distributing any more products, it does not itself mandate any affirmative conduct such as a product recall or restitution to customers who have already bought KHROMA BEAUTY products. *See id.* (remanding preliminary injunction requiring a product recall and restitution as unjustified mandatory injunction).

Moreover, as the Ninth Circuit has explained, an injunction returning the parties to their positions *prior to infringement* does not alter the status quo ante litem. "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.' " *GoTo.com*, 202 F.3d at 1210. In this case, the last uncontested status existed before Boldface began using the KHROMA BEAUTY trademarks. *Id.* ("In this case, the status quo ante litem existed before Disney began using its allegedly infringing logo."). If this were not the case, then "plaintiffs could never bring suit once infringing conduct had begun." *Id.*

In any case, Tillett has agreed to tailor the injunction to permit Boldface's retailers to sell through products in their possession (Reply 22), which the Court finds appropriate.

### F. Bond

Under Federal Rule of Civil Procedure 65(c), upon obtaining an injunction, the movant must post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined and restrained." The Court has wide discretion to set any amount for the bond. *GoTo.com*, 202 F.3d at 1211. Boldface requests a bond of millions of dollars, far surpassing an amount Tillett could pay. The Court finds that amount—or anything approaching it—inappropriate because it would essentially deny Tillett the benefit of the injunction. *See id.; see also Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325, *as amended*, 775 F.2d 998 (9th Cir.1985). Further, Tillett has demonstrated a strong likelihood of success on the merits, which "tips in favor of a minimal bond or no bond at all." *Van De Kamp*, 766 F.2d at 1326.

The Court finds that a $50,000 bond is appropriate under the circumstances. *GoTo.com,* 202 F.3d at 1211 (finding $25,000 bond appropriate for injunction against the Walt Disney Company, which had requested at least $20 million).

## CONCLUSION AND STAY

For the reasons above, Tillett's motion for a preliminary injunction is GRANTED.

At oral argument, Boldface's counsel requested that the Court stay the injunction pending appeal. Boldface does not have a right to a stay; instead, the Court may exercise discretion depending on the circumstances of the particular case. *Lair v. Bullock,* 697 F.3d 1200, 1203 (9th Cir. 2012). In order to stay an injunction, the Court must consider " '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.' " *Id.* (quoting *Nken v. Holder,* 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)). The party requesting the stay bears the burden to show that a stay is warranted, *id.,* and the first two factors are the most critical, *id.* at 1204.

Here, the Court's analysis on the issuance of the preliminary injunction dictates that a stay is not warranted. *See id.* at 1203 n. 2 (noting that " '[t]here is a substantial overlap between these and the factors governing preliminary injunctions.' "). However, the Court will stay entry of the preliminary injunction for at least seven days pursuant to Ninth Circuit Rule 27–2, provided that Boldface seeks a stay from the Ninth Circuit within that time. If Boldface seeks a stay, the Court will stay entry of the injunction until the Ninth Circuit rules on that request. If after the expiration of seven days Boldface has not sought a stay from the Ninth Circuit, the Court will enter the injunction without further notice to the parties. Tillett is not required to post the bond ordered by the Court until the Court enters the injunction. The parties are ORDERED to update the Court of the status of this matter, as well as their further settlement efforts, **no later than seven days from the date of this Order.**

Further, Tillett is ORDERED to lodge a proposed injunction consistent with this opinion **within five days of the date of this Order.**

APPENDIX 1